JONKERS v SUMMIT TOWNSHIP

Docket No. 272203. Submitted March 11, 2008, at Lansing. Decided
     March 20, 2008, at 9:05 a.m.

Wendy W. Jonkers and others brought an action in the Mason Circuit
     Court against Summit Township and the Mason County Road
     Commission, seeking a determination regarding the ownership of
     property on the shoreline of Bass Lake that is separated from the
     plaintiffs' property by Bass Lake Boulevard and that contains a
     boat launch maintained by the defendants. The plaintiffs con-
     tended that the plat for the Gilbert's Addition to Bass Lake Park
     shows that their property line is the shoreline and that Gilbert's
     Addition was made from a lot originally conveyed in 1856 by the
     United States government and that the lot was shown on an 1839
     lot survey by the United States government General Land Office
     (the GLO survey) as having the shoreline as its boundary. The
     defendants claimed that they obtained title to the disputed land
     pursuant to a quitclaim deed that was made in reliance on a survey
     conducted in 1915 (the Mitchell survey) that showed that the
     boundary line shown by the GLO survey had not been completely
     accurate and that Gilbert's Addition did not extend to the shore-
     line. The court, Richard I. Cooper, J., determined that the plaintiffs
     owned the disputed property but that the defendants had acquired
     ownership of the boat launch through adverse possession. The
     court imposed certain restrictions on the use of the boat launch
     and on future improvements to Bass Lake Boulevard. The defen-
     dants appealed and the plaintiffs cross-appealed.

     The Court of Appeals *held*:

     1. Public policy favors considering the boundary to be as
     shown on the GLO survey because only the defendant's title
     flowing from the quitclaim deed would be disrupted, while giving
     the Mitchell survey supremacy would disrupt titles and cause
     confusion with regard to numerous properties in Gilbert's Addi-
     tion. The least mischief flows from considering the boundary to be
     as shown on the GLO survey.

     2. The trial court properly relied on the unambiguous descrip-
     tion of the Gilbert's Addition property itself as being comprised
     entirely of the lot conveyed by the government in 1856, which lot

was considered to extend to the shoreline pursuant to the GLO survey. In addition, in the absence of a clearly expressed contrary intention, the conveyance of a parcel of land bordering a highway contiguous to a lake shore conveys the appurtenant riparian rights.

3. The defendants did not acquire title to all of the property under color of title but did establish the requisite elements of adverse possession with regard to the part of the disputed property occupied by the boat launch.

4. The trial court did not err in determining that the adversely possessed boat launch is 30 feet wide.

5. The township did not assess taxes on the disputed property for which it required the plaintiffs to pay.

6. The restrictions that the trial court placed on future improvements to Bass Lake Boulevard were appropriate.

Affirmed.

BOUNDARIES — SHORELINES.

Where the boundary of a tract in a government survey is a body of water, the boundary is conclusively set to be the body of water wherever it actually lies, even if the location of the water is incorrectly described in the survey and notwithstanding the advancement or recession of the shoreline.

*Carey & Jaskowski, P.L.L.C.* (by *Richard J. Jaskowski*), for the plaintiffs.

*Gavigan, Anderson & Andrews* (by *Roger H. Anderson*), for the defendants.

Before: WHITBECK, P.J., and JANSEN and DAVIS, JJ.

PER CURIAM. The parties appeal as of right the trial court's order holding, in relevant part, that plaintiffs (the Wanzers) owned certain shoreline property on Bass Lake, but also holding that defendants (the township) had acquired ownership of a boat launch on the property through adverse possession, and imposing certain restrictions on the use of the boat launch and on future improvements to Bass Lake Boulevard, which runs

parallel to Bass Lake between the Wanzers' residence and the boat launch. We affirm.

"We review the trial court's findings of fact in a bench trial for clear error and conduct a review de novo of the court's conclusions of law." *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). "Equitable rulings to quiet title, as well as questions of law in general," are reviewed de novo. *Richards v Tibaldi*, 272 Mich App 522, 528; 726 NW2d 770 (2006). However, we defer to the trial court's findings of fact in an action to quiet title; those findings will be given weight and reversed only if they are clearly erroneous. *Davids v Davis*, 179 Mich App 72, 81; 445 NW2d 460 (1989). The clear-error standard requires us to give deference to the lower court and find clear error only if we are nevertheless "left with the definite and firm conviction that a mistake has been made." *Heindlmeyer v Ottawa Co Concealed Weapons Licensing Bd*, 268 Mich App 202, 222; 707 NW2d 353 (2005) (citations and internal quotation marks omitted).

The property at issue in this case is riparian land on the western shore of Bass Lake, in Summit Township, Mason County. The Bass Lake area was first surveyed by the United States government's General Land Office in an 1839 lot survey (the GLO survey). In 1856, the United States government granted a patent conveying to James Dexter "Lot 4 of Section 26, Town 17 North, Range 18 West, containing 54.89 acres," which was shown on the GLO survey as being on the western shore of Bass Lake north of an outlet leading to Lake Michigan. The entirety of the above-described property (hereinafter, Lot 4) was eventually conveyed to Wallace B. Gilbert and Anna M. Gilbert. In 1896, the Gilberts caused the property "to be surveyed, laid out, and platted to be known as Gilbert's Addition to Bass Lake

Park." The Gilbert's Addition plat states that "[t]he land embraced in the annexed plat of Gilbert's Addition to Bass Lake Park is described as follows: Lot 4, Sec 26, T 17 N R 18 W."

The Wanzers own a parcel of property in Gilbert's Addition. The township operates a boat launch on the shore of Bass Lake, directly across Bass Lake Boulevard from the Wanzers' residence. The primary question in this case is whether the Wanzers' property includes the shoreline land. This is not entirely straightforward because, as it turned out, the GLO survey was not completely accurate. In 1915, another survey (the Mitchell survey) of the area was conducted, and it is undisputed that, although it was solely for the purpose of surveying the location of Bass Lake Boulevard and not any property lines, it correctly shows the shape of Bass Lake. More importantly, the Mitchell survey, which even the Wanzers' expert surveyor conceded was likely "mathematically correct," places the boundary between Section 26 and Section 25 as lying somewhat to the west of the shore of Bass Lake, running *through* what is presently regarded as Gilbert's Addition. It is also undisputed that a government lot can only be located within one section, and the boundary depiction in the Mitchell survey would appear to show that some portion of Lot 2 of Section 25 lies between the shore of Bass Lake and Lot 4 of Section 26. In 1944, in apparent reliance thereon, Grace Lattin quitclaimed to the township all land in Lot 2 of Section 25 "lying East of Gilbert's Addition to Bass Lake Park" (the Lattin deed).

Thus, the township asserts that Gilbert's Addition—and therefore the Wanzers' property—does not include the shoreline property on which the boat launch is located, because that property should never have been included in Lot 4; that the Mitchell survey has been

relied on and should therefore be considered conclusive; and that the township received a valid conveyance of that property from its true owner. In contrast, the Wanzers assert that the GLO survey must be considered supreme, that the GLO survey has been relied on, that Lot 4 and therefore Gilbert's Addition extend to the shore, and, therefore, that the Wanzers own the property. The trial court found in favor of the Wanzers, and we agree.

"Public policy clearly favors consistency in ascertaining boundary lines, especially where, as here, a multitude of boundaries has been established in reliance upon the location of the [survey monument at issue in that case]." *Adams v Hoover*, 196 Mich App 646, 651; 493 NW2d 280 (1992). In *Adams*, this Court relied on the law as set forth by Justice COOLEY more than 100 years ago, which is still the law today:

> Nothing is better understood than that few of our early plats will stand the test of a careful and accurate survey without disclosing errors. This is as true of the government surveys as of any others, and if all the lines were now subject to correction on new surveys, the confusion of lines and titles that would follow would cause consternation in many communities. Indeed the mischiefs that must follow would be simply incalculable, and the visitation of the surveyor might well be set down as a great public calamity.
>
> But no law can sanction this course. . . . The question is not how an entirely accurate survey would locate these lots, but how the original stakes located them. No rule in real estate law is more inflexible than that monuments control course and distance,—a rule that we have frequent occasion to apply in the case of public surveys, where its propriety, justice and necessity are never questioned. But its application in other cases is quite as proper, and quite as necessary to the protection of substantial rights. The city surveyor should, therefore, have directed his attention to the ascertainment of the actual location of the original

landmarks . . . and if those were discovered they must govern. If they are no longer discoverable, the question is where they were located; and upon that question the best possible evidence is usually to be found in the practical location of the lines, made at a time when the original monuments were presumably in existence and probably well known. . . . As between old boundary fences, and any survey made after the monuments have disappeared, the fences are by far the better evidence of what the lines of a lot actually are, and it would have been surprising if the jury in this case, if left to their own judgment, had not so regarded them. [*Diehl v Zanger*, 39 Mich 601, 605-606 (1878) (COOLEY, J., concurring) (internal citation omitted).]

In *Adams*, this Court concluded that to "give effect to the technically correct but maverick" survey that contradicted a prior survey upon which numerous boundary lines had relied would be a " 'mischief' " that could not be permitted. *Adams, supra* at 654-655. Justice COOLEY reiterated in *Flynn v Glenny*, 51 Mich 580, 584; 17 NW 65 (1883), that the conclusiveness of government surveys depends not on their accuracy, "but it is whether they were planted by authority, and the lots were purchased and taken possession of in reliance upon them. If such was the case they must govern, notwithstanding any errors in locating them."

In the instant case, it is undisputed that the plat of Gilbert's Addition relied on the GLO survey. The Mitchell survey was not even performed until 19 years later, and the surveyors agreed that as far as they could determine, there had been no other surveys of the area in the interim between the GLO survey and the platting of Gilbert's Addition. It appears that numerous other properties around the Bass Lake area also relied on the GLO survey. In contrast, the only apparent reliance on the Mitchell survey was the Lattin deed. It was also undisputed that giving the GLO survey supremacy would only disrupt titles flowing from the Lattin deed;

in other words, only the township's claim to the boat launch. But giving the Mitchell survey supremacy would disrupt titles and cause confusion to numerous properties within Gilbert's Addition. It is clear that the least mischief would flow from considering the boundary of Lot 4 to be Bass Lake, as shown on the GLO survey.

Furthermore, it is significant that the property at issue—specifically, the property that became Gilbert's Addition—was conveyed by lot from the Federal government, not by metes and bounds. Moreover, the property continued to be described as Lot 4 through the time it *became* Gilbert's Addition; indeed, the description of Gilbert's Addition *is* Lot 4. The conveyance was therefore completely based on the GLO survey; as a consequence, the boundary lines are controlled by the boundary lines depicted in the GLO survey. *Gregory v LaFaive*, 172 Mich App 354, 358-359; 431 NW2d 511 (1988). The property description of Gilbert's Addition is *coextensive* with Lot 4 and, at the time Gilbert's Addition was platted, Lot 4 was considered to extend to the shore of the lake. Although the Gilbert's Addition plat did not explicitly state an intention to extend its boundary to the shore, at that time plats were not required to include such statements, and, in fact, sometimes did not. In the absence of a clearly expressed contrary intention, "the conveyance of a parcel of land bordering on a highway contiguous to a lake shore conveys the appurtenant riparian rights." *Croucher v Wooster*, 271 Mich 337, 344; 260 NW 739 (1935). Given the absence of an explicit statement, the trial court properly relied on the unambiguous description of the property itself; and it correctly found that Gilbert's Addition is coextensive with Lot 4, which extends to the shoreline.

The shoreline of Bass Lake is no longer located where it is shown on the GLO survey, and the present shoreline boundary of Lot 4 is located within the theoretical square of what should be Section 25. However, where the boundary of a tract in a government survey is a body of water, even if the location of that water is incorrectly described in the survey, the boundary is nevertheless conclusively set to be the body of water wherever it actually lies. *Arnold v Brechtel*, 174 Mich 147, 158-160; 140 NW 610 (1913); accord *Grand Rapids & Indiana R Co v Butler*, 159 US 87; 15 S Ct 991; 40 L Ed 85 (1895). Finally, "the rule is well established that courses and distances must give way to natural boundaries," such as natural bodies of water, *Turner v Holland*, 65 Mich 453, 463; 33 NW 283 (1887), and it is equally well established that section lines, not being physical, are not monuments of any sort. *Murray v Buikema*, 54 Mich App 382, 387; 221 NW2d 193 (1974). "Even assuming that a section line is a monument it would yield to the other monuments selected by the grantor to indicate his intention in setting the boundaries of the plat." *Id.* at 387-388. Therefore, it necessarily follows that "[i]n Michigan the law is clear that where property abuts a shore line, that shore line (as represented on government plats by a meander line) is the boundary of the property notwithstanding its subsequent advancement or recession." *Cutliff v Densmore*, 354 Mich 586, 590; 93 NW2d 307 (1958), and this rule would take precedence over the theoretical lie of a section line.

In summary, the trial court correctly determined that Lot 4 of Section 26 had as its eastern boundary the shore of Bass Lake, as indicated in the GLO survey; that the plat of Gilbert's Addition, being described as coextensive with Lot 4 of Section 26, also had as its eastern boundary the shore of Bass Lake; that the Lattin deed

describes land that does not actually exist; and that, therefore, the Wanzers' property extended all the way to the shore of Bass Lake.

However, the trial court also found that the township had acquired ownership of the boat launch itself, which the trial court determined to be a 30-foot-wide strip of land running perpendicularly from Bass Lake Boulevard to the shore, through adverse possession. The township contends that it should have acquired ownership of the entire lakefront parcel through color of deed, or at a minimum a strip of land 55-feet wide. The Wanzers contend that the township failed to prove the required elements of any adverse possession, or, if adverse possession were proven, the township is entitled to no more than 18 feet. Again, we agree with the trial court.

We first disagree with the township's argument that it acquired title to the property under color of title, which would, if true, grant the township constructive possession of all of the premises described in that deed. *Campau v Campau*, 44 Mich 31, 33-34; 5 NW 1062 (1880). An owner of real property may lose title to some or all of the property to an adverse possessor either "through visible, open, notorious, hostile, and continuous possession of the premises for the statutory period" or through an assertion of ownership "under color of deed." *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 719-720; 742 NW2d 399 (2007). "In cases in which the adverse claimant claims title under color of deed, disseisin occurs when the record owner first receives notice of the adverse deed." *Id*. at 720.[1] Nota-

---

[1] However, even under a color-of-title claim, the claimant cannot adversely possess the disputed property without having been in actual possession of some portion thereof. *Westgate v Mathews*, 31 Mich App 480, 483; 188 NW2d 1 (1971).

bly, recordation of an adverse deed is *only* notice to parties *other* than the record landowner, which in this case is the Wanzer family. *Id.* at 720 n 8.

The Wanzers were aware since at least the 1960s, when they were told as much in a letter from the township, that the township claimed to own the boat launch pursuant to a deed from Grace Lattin. However, we find it highly significant that *the township* was not aware of the contents of the Lattin deed until approximately 2002. Of the township officials who testified, some did not know the basis for the township's ownership of the boat launch, and some knew that the township had a deed but had never actually seen the deed. In fact, there was testimony that some township officials believed that the deed only covered the boat launch. There was also testimony that when the instant litigation was commenced, that was the first time the township became aware of the theoretical possibility that they owned *more* than just the boat launch. In fact, the township had apparently allowed property owners north and south of the Wanzers to install docks on the Bass Lake shore because the township was unaware that it might have owned those shoreline properties— which it would under the property description in the Lattin deed.

Although the township clearly believed that it had *a deed* that granted it ownership of the boat launch, that belief was without regard to the true contents of the deed. The trial court correctly found that the township did not have a true claim of adverse possession under color of deed: it is clear that the township did not have any idea of what it theoretically owned under the Lattin deed beyond just "the boat launch." Rather, the situation in this case appears to be one where the township occupied the boat launch in the belief that that was the

true boundary line of what it owned. Therefore, the trial court correctly found the proper analysis to be whether that possession had been "actual, visible, open, notorious, exclusive, continuous, and uninterrupted" for the requisite period.[2] See *Gorte v Dep't of Transportation*, 202 Mich App 161, 170; 507 NW2d 797 (1993); *Adams, supra* at 719-720.

The Wanzers, in turn, argue that the township has failed to establish the requisite elements of adverse possession. We disagree.

In the adverse-possession context, "hostility" refers to use of property without permission and in a manner that is inconsistent with the rights of the true owner. *Wengel v Wengel*, 270 Mich App 86, 92-93; 714 NW2d 371 (2006). Nothing the township did on the property was permissive. It is undisputed that the township put gravel on the boat launch, or at least authorized gravel to be placed there, which would constitute a trespass " 'entitl[ing] the owner to a cause of action against the intruder,' " which is another definition of hostile possession. *Id.* (citation omitted). The township considered itself responsible for helping to extract boats and vehicles that got stuck on the boat launch, even though some neighbors also helped perform extractions. The Wanzers argue that, because the township did not exclude them, the township's possession was not hostile. However, analysis "of what acts or uses are sufficient to constitute adverse possession depends upon the facts in each case and to a large extent upon the character of the premises." *Burns v Foster*, 348 Mich 8, 14; 81 NW2d 386 (1957). The township's possession was hostile in the context of these premises: the township opened up and maintained private property for a widely

---

[2] It is worth reiterating at this point that the requisite period is not disputed.

recognized use by the public. Furthermore, the fact that the township only occasionally did anything on the property is consistent with the area's character as relatively undeveloped and predominantly seasonally occupied.

The fact that the township did not exclude the Wanzers is also consistent with the simple fact that, as public property, the township could not exclude the Wanzers any more than any other persons who wished to use the launch site. Equally critically, the fact that the township never attempted to prevent the Wanzers from using other waterfront areas is immaterial: the testimony indicated that the township did not interfere with the Wanzers because the Wanzers were not interfering with the launch site. This is consistent with a claim of absence of a color of title, but, particularly when combined with the testimony from the neighbors *and* the Wanzers that the launch was regarded as a public site, it is also consistent with possession of the launch that is hostile to the Wanzers' ownership thereof.

The Wanzers rely on the general, and venerable, rule that "[o]ccupation in common with the public is not exclusive possession, neither is possession concurrent with that of the true owner ever exclusive." *LeRoy v Collins*, 176 Mich 465, 475; 142 NW 842 (1913). However, this rule is also dependent on the character of the premises. In *LeRoy*, the claimant was attempting to adversely possess *as private property* a thoroughfare through which others traveled. The situation in the instant case is the opposite: the claimant is attempting to adversely possess *as public property* a parcel of land that was ostensibly private and thus closed to members of the public. "Possession" refers to an exercise of dominion over the property, "and there may be degrees

even in the exclusiveness of the exercise of ownership." *Murray v Hudson*, 65 Mich 670, 675; 32 NW 889 (1887). When viewed in the context of the character of the premises, the township's acts that unambiguously communicated to the public that it was the owner of a public boat launch constitute acts of dominion over the property that excluded any dominion the Wanzers had over the property.

The parties finally dispute how much property the township adversely possessed. It is not disputed that the statutory cut-off period was just before the date the asphalt was put in. The evidence was that, before the paving, the gravel boat launch was anywhere from 15- to 30-feet wide, the best estimate being approximately the width of two boat trailers side by side. The Wanzers estimate "two boat trailers side by side" to be approximately 18 feet in width. However, there was also evidence that boat trailers could not just be backed straight in perpendicularly from the road, and they would need some room on either side to maneuver. When the asphalt was put in, the township apparently instructed the pavers at that time to pave only the area that was already in use, but the township's supervisor conceded that it may have been widened "a little bit." According to a survey performed by the Wanzers' expert, the asphalt strip was 23.9 feet wide in 1989. With the addition of some maneuvering room, 30 feet is a sensible, rational, and appropriate finding of fact regarding the width of the adversely possessed boat launch. We therefore reject the Wanzers' contention that the township adversely possessed no more than 18 feet.

We likewise reject the township's claim that it adversely possessed approximately 55 to 60 feet, which was based on the fact that an "open area" was routinely

and undisputedly used by members of the public for a wide variety of activities, ranging from fishing and picnics to bonfires. The township only held itself out to be operating a *boat launch*. All the testimony indicated that the premises were a *boat launch* that members of the public, to the consternation of neighbors, often used for other purposes. The fundamental purpose of the property was to put boats into the water at the only spot on the lake where that could be done. The only control the township exercised over the area before the paving was the occasional placing of gravel and the occasional extraction of a boat or vehicle stuck in the gravel—both of which pertain *only* to the actual boat-launch ramp, not to the remainder of the "open area." The lack of exercised control over the entirety of the "open area" is inconsistent with adverse possession thereof. In the absence of action by the governmental entity, the mere fact that members of the public used a parcel of property is insufficient to establish a public easement. *Kempf v Ellixson*, 69 Mich App 339, 343-344; 244 NW2d 476 (1976). The principle here is sufficiently similar that the same analysis should apply.

The Wanzers argue that the township cannot claim adverse possession of property for which it assessed taxes to be paid by the Wanzers. This Court explained in *Bachus v West Traverse Twp (On Remand)*, 107 Mich App 743; 310 NW2d 1 (1981), and *Bachus v West Traverse Twp*, 122 Mich App 557; 332 NW2d 535 (1983), that it would be intolerable and unjust[3] for a governmental agency to claim adverse possession of property while simultaneously including that property

---

[3] The *Bachus* opinions discussed the concept of "chutzpah," which is the kind of gall shown by a defendant who, after being convicted of killing his or her parents, seeks a lenient sentence because he or she is an orphan.

in the tax description of the dispossessed landowner. But in the instant case, the township's tax assessments of the Wanzers' property and of the boat-launch area is consistent with its good-faith belief that the township owned the boat-launch area. The township kept a separate tax parcel for what it believed to be its separately owned land on the shore of Bass Lake, and there was testimony at trial that the Wanzers' property and the surrounding properties were taxed at 80 percent of the rate applicable to lakefront property. Again, we find that the Wanzers' property description in fact extends to the lake, and the township's property description therefore does not exist. But the township believed otherwise, and the trial court did not clearly err in finding that the township made no attempt to "double dip."

We find no clear error in the trial court's determination that the township adversely possessed a 30-foot-wide strip of land from Bass Lake Boulevard to Bass Lake.

Finally, the township objects to language in the trial court's judgment that states, "Defendants shall not expand the width of Bass Lake Boulevard adjacent to the boat ramp in a manner inconsistent with the full length of Bass Lake Boulevard." It is undisputed that the purpose behind this language was to prevent the township, or any subentity thereof, from retaliating against the Wanzers or from finding a creative way to exercise its discretion to circumvent the trial court's order. Moreover, the township recognizes this purpose to be appropriate. The township is concerned that there may someday be a legitimate need to perform some kind of road maintenance, including widening the road, on Bass Lake Boulevard in front of the boat launch but not elsewhere, and furthermore that the trial court's order

interferes with its ability to properly manage the roadway pursuant to its constitutional authority and responsibility.

However, the township suggests no alternative way to accomplish the trial court's concededly warranted goal, and, in any event, we do not share the township's interpretation of the trial court's language. Nothing in the trial court's order was intended to prevent the township from doing whatever needs to be done to the road, but, rather, only to ensure that the area in front of the boat launch did not receive any modifications that were not strictly for road purposes, as opposed to boat-launch purposes. The township's interests in the road and in the boat launch are very different. The township owns the boat launch in fee through adverse possession, but its interest in the road is much more limited: platted public roads convey either a mere public easement or, at most, a "base fee" that amounts to little more than nominal title and no beneficial ownership whatsoever. *Village of Kalkaska v Shell Oil Co (After Remand)*, 433 Mich 348; 446 NW2d 91 (1989). The trial court's use of the word "inconsistent" in its order does not forbid the township from making necessary improvements to the road, but, rather, only from making improvements to the road that are not for roadway purposes. In any event, if a future controversy arises, the parties can petition the court for direction with regard to this issue as applied to a specific modification.

Affirmed.